## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

**KEITH A. HALL,**       )
    Plaintiff       )
           )
v.       )       Civil Action No. 2:10cv00035
           )
**MICHAEL J. ASTRUE,**       )       **REPORT AND RECOMMENDATION**
  **Commissioner of Social Security,**       )
    Defendant       )       BY: PAMELA MEADE SARGENT
           )       United States Magistrate Judge

*I. Background and Standard of Review*

Plaintiff, Keith A. Hall, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hall filed his application for DIB on January 26, 2007, alleging disability as of October 1, 2005, due to post-traumatic stress disorder, ("PTSD"), anxiety and panic disorder, depression and back problems. (Record, ("R."), at 93-95, 126, 158.) The claim was denied initially and on reconsideration. (R. at 58-60, 63, 65-67, 69-71.) Hall then requested a hearing before an administrative law judge, ("ALJ"). (R. at 74-75.) The hearing was held on June 10, 2008, at which Hall was represented by counsel. (R. at 17-47.)

By decision dated September 23, 2008, the ALJ denied Hall's claim. (R. at 9-16.) The ALJ found that Hall met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2007.[1] (R. at 11.) The ALJ also found that Hall had not engaged in substantial gainful activity since October 1, 2005, the alleged onset date. (R. at 11.) The ALJ determined that the medical evidence established that, through the date last insured, Hall had severe impairments, namely a back injury with degenerative disc disease and anxiety

---

[1] Because Hall last met the insured status requirements of the Act for DIB purposes on June 30, 2007, he must establish that he became disabled on or before this date last insured.

attacks, but he found that Hall's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, through the date last insured. (R. at 11-13.) The ALJ also found that, through the date last insured, Hall had the residual functional capacity to perform light[2] work that allowed for a sit/stand option at 30-minute intervals, that did not require more than occasional climbing, stooping or crouching, that did not involve exposure to unprotected heights or hazards and that could be performed by an individual who could be expected to be off-task for approximately 15 minutes once weekly. (R. at 13.) Therefore, the ALJ found that Hall was able to perform his past relevant work as a paralegal and office assistant. (R. at 15.) Thus, the ALJ found that Hall was not under a disability as defined under the Act and was not eligible for benefits. (R. at 16.) *See* 20 C.F.R. § 404.1520(f) (2010).

After the ALJ issued his decision, Hall pursued his administrative appeals, (R. at 91), but the Appeals Council denied his request for review. (R. at 1-5.) Hall then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2010). The case is before this court on Hall's motion for summary judgment filed February 10, 2011, and the Commissioner's motion for summary judgment filed March 11, 2011.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2010).

Hall was born in 1971, (R. at 93), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Hall has a college education with a degree in Administration of Justice, and he began to read the law under a local attorney, but did not complete the process. (R. at 20-21.) He testified that he served as a firefighter in the United States Navy from 1994 to 1999. (R. at 22.) He stated that he had given up his driver's license due to "bad anxiety" about driving. (R. at 23.) He testified that he worked as a roof bolter setup man in an underground mine for a couple of months in 2006. (R. at 23-24.) However, Hall testified that he stopped working when he had an anxiety attack, "blanked out" and ran a piece of machinery into a rib causing cement blocks to fall on top of him. (R. at 24.) He testified that he had past relevant work experience as a truck driver, but quit this job after being involved in a work-related motor vehicle accident. (R. at 25-26.) Hall testified that he also had worked as a paralegal and an office assistant for an attorney, but quit that job due to his anxiety. (R. at 26-27.) Hall further testified that he worked as a cable installer, but stopped after falling off of a pole due to a panic attack. (R. at 29.)

Hall testified that he had taken Lortab since 1998 due to a military service-related injury. (R. at 30-31.) He stated that he underwent a narcotics detoxification program at the Veterans' Administration Medical Center, ("the VA"), in 2006. (R.

---

[3] Because Hall challenges on appeal only the ALJ's findings with regard to his mental impairments, facts relating to Hall's physical impairments and medical records dated beyond Hall's date last insured are included only for clarity of the record where necessary.

at 31.) Afterwards, however, his doctor reinitiated Lortab for his back pain. (R. at 31.) He further testified that in early 2008, he voluntarily checked himself into drug rehabilitation to try to stop taking Lortab, noting that he continued to work with Narcotics Anonymous. (R. at 30-31.) Hall testified that he had been diagnosed with PTSD resulting from an incident involving a fire on his Navy ship resulting in both injuries and deaths to fellow crewmembers. (R. at 33.) He stated that he was receiving PTSD treatment three to five times weekly at the VA. (R. at 33-34.)

Hall testified that he began experiencing anxiety attacks while in the military. (R. at 37-38.) He stated that he was receiving service-connected VA benefits at 60 percent, 50 percent of which was for anxiety. (R. at 38.) Hall testified that he experienced panic attacks from once weekly to daily, lasting anywhere from five minutes to six hours. (R. at 40-41.) He testified that he had difficulty sleeping, despite taking medication. (R. at 41-42.) Hall stated that he was taking medication for his anxiety. (R. at 43.) The ALJ ordered a consultative psychological evaluation. (R. at 45.)

Jean Hambrick, a vocational expert, also was present and testified at Hall's hearing. (R. at 44-45.) Hambrick classified Hall's work as a roof bolter as medium[4] and semiskilled, possibly heavy[5] on occasion. (R. at 45.) She classified his work

---

[4] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2010).

[5] Heavy work involves lifting items weighing up to 100 pounds with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can

as a truck driver as medium and semiskilled, his work as a paralegal as light and skilled and as a cable installer as heavy and skilled. (R. at 45.)

In rendering his decision, the ALJ reviewed records from Dr. Kevin Blackwell, D.O.; Regional Rehabilitation Center; James H. Quillen Veterans' Administration Medical Center, ("the VA"); Wise Medical Group Health Care Associates; Dr. Richard Surrusco, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. R. Michael Moore, M.D.; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Mountain Home Veterans' Administration Medical Center, ("the VA"); and B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist. Hall's counsel submitted additional medical records from the VA to the Appeals Council.[6]

When Hall was seen at the VA on January 28, 2002, he reported a history of panic attacks, stating that he was on Klonopin and had tried Serax, Ativan and Soma. (R. at 318.) He was alert and fully oriented with no abnormal thought processes and a normal affect. (R. at 321.) Hall was diagnosed with a panic disorder, and he was prescribed Celexa. (R. at 321.) On February 24, 2003, Hall called the VA to request a mental health referral due to panic attacks. (R. at 305.)

---

perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2010).

[6] Since the Appeals Council considered these records in deciding not to grant review, (R. at 1-5), this court also must consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

On April 22, 2003, Hall reported a history of panic disorder since 1996, noting anxiety around people and feeling as if he was going to die. (R. at 302.) He described once weekly panic attacks as feeling nervous and jittery emotionally, but he denied any physical symptoms. (R. at 302.) He denied any then-current depressive symptoms. (R. at 302.) Hall reported that he worked for an attorney and sometimes had to leave court or other public places due to his anxiety. (R. at 302.) However, Hall stated that his social life was not impaired by this anxiety. (R. at 302.) He reported having taken Paxil for five to six months, but stopped because it made him feel weird. (R. at 302.) Hall reported maximum benefits from Klonopin. (R. at 302.) He denied any PTSD or psychotic symptoms. (R. at 302.) Mental status examination showed an "ok" mood with congruent affect, clear, logical and goal-directed thought process, intact concentration, intact memory, good judgment, good to fair insight and good general fund of knowledge. (R. at 303-04.) Hall was diagnosed with social anxiety disorder, not otherwise specified; rule out panic disorder; rule out alcohol abuse; and rule out alcohol-induced anxiety disorder. (R. at 300.) His then-current Global Assessment of Functioning, ("GAF"),[7] score was assessed at 55.[8] (R. at 300, 304.) The notes from the VA show that Hall did not return for follow-up treatment. (R. at 299.)

Hall saw Dr. R. Michael Moore, M.D., from October 2004 to April 2007.

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), at 32.

[8] A GAF score of 51 to 60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning. . . ." DSM-IV at 32.

(R. at 431-43.)  Over this time, he was consistently diagnosed with an anxiety disorder, and Dr. Moore prescribed Soma and Klonopin.  (R. at 431-37, 440-43.) However, no mental status examinations were documented in these treatment notes by Dr. Moore.

When Hall was seen at Wise Medical Group Health Care Associates on March 30, 2005, it was noted that he suffered from panic attacks, but that they were "pretty much controlled" on medications.  (R. at 351.)  On May 28, 2005, he stated that he was "doing pretty good" in relation to these panic attacks.  (R. at 350.)  When Hall saw Dr. Marie Stemple, M.D., on July 14, 2005, he stated that overall, things were going well, noting that his nerves were doing "okay" as long as he took his medication.  (R. at 347.)  Hall was pleasant and cooperative with a good mood and full affect, and he was very interactive.  (R. at 348.)  Dr. Stemple refilled his Klonopin, noting that Hall's anxiety was controlled at the present time. (R. at 348.)  When he saw Dr. Stemple on September 8, 2005, for a routine follow-up, Hall noted that his anxiety was doing well on medication.  (R. at 344-45.)  His mood was good with a full affect.  (R. at 345.)  Likewise, on November 3, 2005, Hall's anxiety was stable and doing well on medication.  (R. at 341-42.)  Dr. Stemple continued Hall on Klonopin.  (R. at 342.)  On December 19, 2005, Hall was seen at the VA for an examination to determine the presence of a panic disorder with agoraphobia.  (R. at 362-65.)  Hall appeared socially appropriate and generally understood the instructions for each task.  (R. at 363.)  He complained of panic attacks beginning eight years previously, which occurred from one to two times daily to once every eight days and lasting from 15 to 20 minutes. (R. at 363.)

Hall described these panic attacks as feeling like he was "going crazy, having a heart attack and suffocating." (R. at 363.) He stated that he was unemployed due to his panic attacks, but was then-currently looking for employment. (R. at 364.) Mental status examination showed that Hall was alert and oriented with clear and coherent speech and that he had normal thought processes and the ability to manage activities of daily living and make reasonable life decisions. (R. at 364.) Cognitive functions were grossly intact, and Hall was deemed to be functioning in the average range of intelligence. (R. at 364.) His affect was mildly anxious, and his mood was worried. (R. at 364.) Hall reported no triggers for his panic attacks, stating that they occurred "out of the blue." (R. at 364.) He reported no agoraphobia. (R. at 365.) Hall was diagnosed with panic disorder without agoraphobia, and his then-current GAF score was assessed at 60. (R. at 365.)

On December 20, 2005, Dr. Stemple again stated that Hall's anxiety and panic attacks were controlled with medication. (R. at 338.) On January 18, 2006, Hall reported that his anxiety was doing well, stating that he felt better than he had in a long time. (R. at 335-36.) He reported that mentally, things were going well for him and he was doing "quite well." (R. at 335.) Again, Dr. Stemple stated that Hall's anxiety and panic attacks were well-controlled with medication. (R. at 335.)

On February 21, 2006, Hall reported worsening anxiety over the previous few weeks. (R. at 332.) He denied depression or suicidal ideation, but requested a referral to the mental health clinic at the VA. (R. at 332.) Dr. Stemple noted that Hall did not appear anxious or depressed, but she prescribed Zoloft and referred

him to the mental health clinic.  (R. at 332-33.)  On April 5, 2006, Hall reported that he quit taking Zoloft after two or three days because it made him nauseated. (R. at 329.)  However, he stated that he reinitiated Klonopin which was helping "pretty well."  (R. at 329.)  He, nonetheless, stated that he was having a lot of panic attacks, but again denied suicidal ideation.  (R. at 329.)  He noted a lot of stress in his life.  (R. at 329.)  Hall's affect was a little flat, but he did not appear to be anxious.  (R. at 330.)  Dr. Stemple diagnosed anxiety and refilled Hall's Klonopin. (R. at 330.)

Hall saw Dr. Kevin Blackwell, D.O., on July 14, 2006, with complaints of back pain.  (R. at 196.)  Hall stated that he was lifting some block while standing in some mud and he felt that he twisted and injured his back.  (R. at 196.)  Hall was alert and fully oriented with good mental status.  (R. at 196.)  When Hall presented for physical therapy on July 17, 2006, he reiterated that he lifted a block at work in the coalmines, then turned around and stepped in a hole with his left foot, twisting his whole body and causing him to fall to the ground.  (R. at 199.)  On August 8, 2006, Hall was again alert and fully oriented with good mental status.  (R. at 197.) On August 23, 2006, Dr. Stemple noted that Hall's panic attacks remained under control with medication.  (R. at 326-27.)

Hall was admitted to the VA for approximately one week beginning on December 4, 2006, for narcotics detoxification.  (R. at 223-90.)  He reported a desire to stop narcotics use because it had robbed him of his energy and his ability to enjoy activities of daily living.  (R. at 224.)  He denied prominent depression out

of context of narcotic use, and he denied suicidal or homicidal ideation, anxiety, panic attacks or memory loss. (R. at 224, 278.) Hall reported feelings of anxiety and hopelessness during the previous month, but denied PTSD issues. (R. at 275.) Specifically, he reported no traumatic experiences while in the Navy. (R. at 276.) Upon admission, Hall was diagnosed with opiate dependence and rule out anxiety disorder, and his then-current GAF score was assessed at 38.[9] (R. at 265.) Hall's course of detoxification was safe and uneventful. (R. at 224.) Upon discharge on December 11, 2006, Hall was stable, and he was diagnosed with polysubstance dependency; substance-induced mood disorder; generalized anxiety disorder by history; and rule out bipolar disorder. (R. at 223.) His then-current GAF score was assessed at 46.[10] (R. at 223.) He was described as alert and oriented, pleasant and cooperative, and he was noted to be independent in all activities of daily living. (R. at 227.) Hall's treating physicians found no severe and persistent mental illness and no severe functional impairment. (R. at 230.) A psychiatry screening showed normal attention span/memory and no cognitive barriers. (R. at 233.) A PTSD screening was negative. (R. at 234.) He was prescribed Zoloft. (R. at 223, 229.)

When Hall saw Dr. Bryan T. Arnette, M.D., with Wise Medical Group Health Care Associates, on December 18, 2006, he reported having a lot of

---

[9] A GAF score of 31 to 39 indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. . . ." DSM-IV at 32.

[10] A GAF score of 41 to 50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning. . . ." DSM-IV at 32.

problems with anxiety due to being out of medications for several weeks and due to being in and out of court related to his workers' compensation claim. (R. at 324-25.) Dr. Arnette prescribed clonazepam.[11] (R. at 324.)

On March 20, 2007, Louis Perrott, Ph.D., a state agency psychologist, completed a mental assessment, finding that Hall suffered from a nonsevere affective disorder, anxiety-related disorder and substance addiction disorder. (R. at 416-29.) Specifically, Perrott found that Hall suffered from depressive disorder, not otherwise specified; substance-induced mood disorder; panic disorder without agoraphobia; anxiety state, not otherwise specified; generalized anxiety disorder; PTSD; opioid dependence; and polysubstance dependence. (R. at 419, 421, 424.) Perrott opined that Hall was only mildly restricted in his activities of daily living, experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation, each of extended duration. (R. at 426.) He found Hall's mental allegations to be mostly credible. (R. at 429.) However, based on records from the VA and Hall's treating physician, Perrott concluded that the medical evidence did not establish the presence of a severe and disabling mental impairment. (R. at 429.)

Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on July 9, 2007, finding that Hall

_____

[11] Clonazepam is the generic name for Klonopin.

suffered from a nonsevere affective disorder, anxiety-related disorder and substance addiction disorder. (R. at 444-57.) Leizer's findings echoed those of state agency psychologist Perrott.

In July and October 2007, Dr. Moore continued to diagnose Hall with an anxiety disorder, and he continued him on Klonopin. (R. at 537-38.)

On April 12, 2008, Hall was again admitted to the VA for detoxification of narcotic pain medication. (R. at 471-531.) He was calm and cooperative, but appeared somewhat anxious at times with a blunted affect and mood. (R. at 525.) He was free of paranoia, delusions, ruminations and psychosis. (R. at 525.) He was alert and fully oriented with intact memory and marginal concentration. (R. at 525.) Hall had a fair amount of general knowledge and fair insight and judgment. (R. at 525.) He was diagnosed with opiate dependence and an anxiety disorder, and his then-current GAF score was assessed at 36. (R. at 526.) Hall reported anxiety due to opiate withdrawal. (R. at 508.) Upon discharge on April 18, 2008, his condition was improved and stable. (R. at 471.) His affect was full, thought process was linear, logical and goal-directed, memory, attention and concentration were grossly intact, knowledge and intelligence were average, insight and judgment were good, and executive functions were good. (R. at 474.) He was diagnosed with opiate dependence, PTSD and rule out anxiety disorder. (R. at 471.) His then-current GAF score was assessed at 45. (R. at 471.) Hall was prescribed Venlafaxine. (R. at 471.) Treatment notes reflect that Hall did well during his treatment, occasionally complaining of anxiety, but reportedly less than

before admission.  (R. at 473.)

Hall continued to receive treatment at the VA through August 2008.  On May 6, 2008, Hall admitted to snorting three to four Lortab pills four or five days earlier.  (R. at 615.)  He denied persistent depressed mood.  (R. at 616.)  Hall's thought process was logical and coherent, concentration was good, long-term, short-term and immediate recall were intact, judgment was impaired due to substance dependence, and insight was limited.  (R. at 618-19.) Hall was diagnosed with opioid dependence and anxiety disorder, not otherwise specified, with a provisional diagnosis of PTSD.  (R. at 619.)  His then-current GAF score was 50.  (R. at 619.)  Hall was continued on Effexor and was referred for counseling.  (R. at 620.)  A depression screen was negative.  (R. at 622.)  On May 13, 2008, Hall received counseling for his opioid dependency.  (R. at 610-11.)  He was alert and oriented with an anxious mood.  (R. at 611.)  Insight was good, but judgment was impulsive.  (R. at 611.)  Hall was diagnosed with major depression and opiate abuse, and his GAF score was placed at 51.  (R. at 612.)  Hall began Suboxone treatment on May 19, 2008.  (R. at 586.)  His GAF score was placed at 50 at that time.  (R. at 588.)  He reported experiencing a panic attack earlier that day. (R. at 590.)  It was noted that his panic attacks could be related to his withdrawal. (R. at 591.)  On May 20, 2008, Hall reported another panic attack, but stated it could be difficult to distinguish between a panic attack and opiate withdrawal. (R. at 578.) Mental status examination was unremarkable. (R. at 578-79.) Hall's GAF score remained at 50.  (R. at 581.)  He continued Suboxone treatment.  (R. at 581.)  Hall noted some brief, transient episodes of confusion. (R. at 583.)  He was alert and

oriented, his mood was "alright," and his affect was appropriately full. (R. at 583-84.) Hall appeared cognitively intact, and his GAF score remained at 50. (R. at 584, 586.)

On May 21, 2008, Hall described his mood as "pretty good." (R. at 569.) He reported having experienced another panic attack. (R. at 569.) Hall's mood was calmer with a subdued affect. (R. at 571.) Insight and judgment were improved, and memory was intact. (R. at 571.) Hall's then-current GAF score was 50. (R. at 571.) It was noted that Hall's panic attacks needed to be addressed with an increased dosage of Effexor. (R. at 571-72.) Hall reported some difficulty concentrating and some memory issues that he related to his withdrawal. (R. at 573.) On May 22, 2008, Hall reported having three panic attacks that week. (R. at 561.) His mood was "pretty good" with a full affect, and he was cognitively intact. (R. at 562.) Hall's GAF score was placed at 50. (R. at 565.) His Suboxone dosage was increased. (R. at 565.) On May 23, 2008, Hall was alert and fully oriented, but complained of difficulty concentrating. (R. at 557.) Hall's insight was good, and he had some difficulties with recent memory recall. (R. at 557-58.) Hall's GAF score remained at 50. (R. at 558.) On May 27, 2008, mental status examination was unremarkable, and his GAF score remained at 50. (R. at 543, 545.) Hall reported that he continued to have "blank outs, . . . get dizzy and have blurred vision, especially when [he] ha[s] anxiety attacks." (R. at 547.) Hall's GAF score remained at 50. (R. at 548.)

On June 2, 2008, Hall reported that his father had died of bone cancer. (R.

at 786.) The following day, his mood was "not good," and his affect was appropriately despondent. (R. at 780.) His mental status examination was unremarkable, and his then-current GAF score was 50. (R. at 780-81.) His dosage of Effexor was increased. (R. at 782.) On June 6, 2008, Hall's GAF score remained unchanged. (R. at 772.) He reported some difficulty concentrating and focusing. (R. at 775.) Hall expressed an interest in attending classroom style group therapy sessions to educate him about PTSD and group and/or individual psychotherapy focused on helping him with his PTSD symptomatology. (R. at 777-78.) On June 11, 2008, Hall was alert and oriented, and he noted that counseling and medication had greatly helped him during the difficult time of his father's death. (R. at 766-67.) Hall's GAF score was placed at 50. (R. at 768.) On June 18, 2008, Hall's mental status examination was unremarkable except for some complaints of memory difficulties associated with panic attacks. (R. at 754-55.) Hall commented that "[g]etting off the opiates I am doing better." (R. at 755.) Hall's GAF score remained at 50. (R. at 756.) The following day, Hall was "quite anxious." (R. at 752.) On August 22, 2008, Hall's mental status examination was unremarkable, and his GAF score remained at 50. (R. at 750.) It was noted that Hall's panic attacks were not completely controlled with his then-current Effexor dosage, but it might become more effective in a few more weeks. (R. at 750.)

Hall saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on July 16, 2008, for a consultative psychological evaluation. (R. at 625-33.) Hall stated that he continued to have images and daily thoughts about a fire that burned some

of his fellow crewmembers to death while serving in the Navy.  (R. at 627.)
Lanthorn reviewed the records from the VA which included Hall's admission for
detoxification in April 2008, as well as treatment notes from Dr. Stemple dated
2006.  (R. at 627.)  Lanthorn opined that Hall was functioning in the average range
of intelligence.  (R. at 628.)  Hall reported that, despite taking medications, he was
very depressed and often grouchy and irritable with feelings of worthlessness and
uselessness.  (R. at 629.)  He admitted to occasional suicidal ideation with no plan.
(R. at 629.)  He stated that he frequently preferred to be alone, and he noted that
his short-term memory had become "very poor" with erratic to poor concentration.
(R. at 629.)  Hall displayed no signs of delusional thinking, but reported having
some "visions" since his father's death, and he noted that he sometimes heard
things such as his name being called.  (R. at 629.)  Lanthorn, however, found that
these did not rise to the level of "full-fledged hallucinations."  (R. at 629.)  Hall
reported two to three panic attacks per week triggered by stressors and lasting from
10 to 30 minutes.  (R. at 630.)

Lanthorn administered the Personality Assessment Inventory, ("PAI"),
which suggested that Hall had significant thinking and concentration problems
accompanied by marked concerns about his physical functioning.  (R. at 630.)
Test results also indicated a number of difficulties consistent with a significant
depressive experience and that Hall was experiencing marked anxiety and tension
which may inhibit his ability to meet even minimal role expectations without
feeling overwhelmed.  (R. at 630-31.)  Hall's test results indicated that even
relatively mild stressors were sufficient to precipitate a major crisis for him.  (R. at

631.)  Lanthorn further noted that Hall's anxiety negatively affected his ability to concentrate and attend to tasks.  (R. at 631.)  Hall's test results indicated that he was likely to have poor judgment, be socially isolated with few interpersonal relationships and have somewhat limited social skills.  (R. at 631.)  Thought processes were likely to marked by confusion, distractibility and difficulty concentrating.  (R. at 631.)  Lanthorn found that Hall was likely to be quite emotionally labile and to display fairly rapid and extreme mood swings.  (R. at 631.)  He described Hall's overall mood as an "agitated depression."  (R. at 632.)  Lanthorn further opined that Hall had significant problems with short-term memory loss, concentration and focusing attention.  (R. at 633.)  He opined that Hall would need ongoing psychiatric and psychotherapeutic intervention for the foreseeable future.  (R. at 633.)

Lanthorn diagnosed chronic PTSD; recurrent, severe major depressive disorder; panic disorder without agoraphobia; generalized anxiety disorder; chronic pain disorder associated with both psychological factors and general medical conditions; and opioid dependence in early full remission. (R. at 632.)  Lanthorn assessed Hall's then-current GAF score as 45 to 50. (R. at 632.)  He found him capable of managing his own funds, but his prognosis was deemed to be guarded, at best. (R. at 632.) Lanthorn concluded by stating that "[f]rom a psychological point of view and when all factors are considered, it is the examiner's opinion that Mr. Hall is incapable of functioning in a 40-hour per week job on a regular basis." (R. at 633.)

Lanthorn also completed a mental assessment, finding that Hall was mildly limited in his abilities to understand, remember and carry out simple job instructions. (R. at 634-36.) He found that Hall was moderately limited in his ability to make judgments on simple work-related decisions and that he was markedly limited in his abilities to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with the public, supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 635.) Lanthorn specified only Hall's diagnoses as supportive of his assessment. (R. at 634-35.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1250(a) (2010).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Hall argues that the ALJ erred in his evaluation of his mental impairments and resulting effects on his ability to work. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-11.) Specifically, Hall argues that the ALJ erred by according little weight to the opinion of psychologist Lanthorn, instead according great weight to the opinions of the state agency psychologists. (Plaintiff's Brief at 10-11.) Hall argues that this was error, as Lanthorn's was the only opinion of record by an examining source. (Plaintiff's Brief at 10.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See*

*Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

I note at the outset that the Social Security Regulations provide that, in general, more weight is given to the opinion of an examining source than to the opinion of a nonexamining source. *See* 20 C.F.R. § 404.1527(d)(1) (2010). Moreover, the Regulations state that the weight to be given to nonexamining sources depends on the degree to which they provide supporting explanations for their opinions and the degree to which they consider all of the pertinent evidence in a claim, including the opinions of treating and other examining sources. *See* 20 C.F.R. § 404.1527(d)(3) (2010). Here, state agency psychologist Perrott considered treatment notes from the VA dated December 2005 and December 2006, as well as notes from Dr. Stemple through December 2006. (R. at 428.) Perrott further noted that Hall's mental symptomatology was controlled with medication. (R. at 428-29.) State agency psychologist Leizer considered all the same evidence as Perrott, but additionally noted treatment records from Dr. Stemple dated January 2007 and April 2007. (R. at 456-57.) These additional records showed only that Hall

continued to be prescribed medication. (R. at 456-57.) Thus, it appears that the state agency psychologists considered all the pertinent evidence. While Hall argues that Perrott and Leizer did not have the benefit of reviewing the findings of psychologist Lanthorn and some treatment notes from the VA, I find that these records are not pertinent to the relevant time period. Lanthorn's examination of Hall was performed more than a year after Hall's date last insured, and nothing contained therein relates his opinions to the relevant time period before the court. The same can be said of the treatment notes from the VA that post-date Hall's date last insured.

Additionally, Hall attempts to support his argument by listing his various mental diagnoses. However, it is well-settled that diagnoses alone are insufficient to show disability. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Instead, a claimant must show functional limitations associated with such diagnoses resulting in an inability to perform substantial gainful activity. *See Gross*, 785 F.2d at 1166; *see also Hays*, 907 F.2d at 1458; *Price v. Barnhart*, 2005 WL 3477547, at *6 (W.D. Va. Dec. 13, 2005). Here, no treating or nontreating source placed *any* functional limitations on Hall during the relevant time period as a result of his mental impairments. From October 2004 to October 2007, a treating physician, Dr. Moore, consistently diagnosed Hall with an anxiety disorder and prescribed Klonopin. (R. at 431-43, 537-38.) I note, however, that Dr. Moore imposed no limitations on Hall, nor do his treatment notes even contain any mental status examinations or clinical findings to support such a diagnosis. Likewise, treatment notes from Dr. Stemple, another treating physician, show that Hall's anxiety was treated with, and controlled by, medication from March 2005 through April 2006. (R. at 329-51.) Treatment notes from the VA during the relevant time

period include no limitations on Hall's activities as a result of any mental impairments, and they, too, reveal that Hall's symptoms were controlled with medication. Finally, the state agency physicians placed no more than mild limitations on Hall, finding that he did not suffer from a severe mental impairment. (R. at 416-29, 444-57.) Thus, Hall's mental impairments were treated conservatively and effectively during the relevant time period. It is well-settled that "if a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross*, 785 F.2d at 1166.

I further find that, even if Lanthorn's opinions were rendered during the relevant time period or related back to such time, they are not supported by the substantial evidence of record. In addition to the reasons just stated, treatment notes from the VA post-dating Hall's date last insured, but prior to Lanthorn's evaluation, show that Hall's mental status examinations were unremarkable, and he noted less anxiety after undergoing detoxification of opiates. (R. at 473-74, 525.) Again, no limitations were imposed on Hall.

It is for all of these reasons that I find that substantial evidence supports the ALJ's weighing of the medical evidence. I further find, for the same reasons, that the ALJ's mental residual functional capacity finding is supported by substantial evidence and that the ALJ gave Hall the benefit of the doubt in restricting him to work that allowed him to be off-task for 15 minutes once weekly.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now

submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists to support the Commissioner's weighing of the medical evidence;

2.  Substantial evidence exists to support the Commissioner's mental residual functional capacity finding; and

3.  Substantial evidence exists to support the Commissioner's finding that Hall was not disabled under the Act and was not entitled to DIB benefits at any time on or prior to his date last insured.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hall's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The

judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     July 19, 2011.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE